THE PRESIDENT, DIRECTORS, AND COMPANY OF THE FARMERS' BANK OF VIRGINIA, APPELLANTS, v. HORACE H. GROVES, ADMINISTRATOR OF MOSES GROVES, DECEASED.

The principles of law decided in this case are so dependent upon the facts that a succinct statement of the latter becomes necessary.

Collier was in possession of two drafts drawn by King upon Groves and accepted by him for the accommodation of King. Collier pledged these drafts to the Farmers' Bank of Virginia, as collateral security for a debt which he owed the bank.

The drafts not being paid at maturity, the bank sued both Groves and King, and recovered judgments against them, which were liens upon their property.

Collier and King then agreed, that if Collier were to purchase King's property at a certain sum, he would return his drafts to him and free him from the bank. To this agreement Groves was a witness, and the purchase was accordingly made.

Collier and the bank then agreed that the bank should give him time and he should

give additional collateral security to the bank and mortgage his property; first reducing the liens of prior mortgages down to a certain sum. The bank was moreover to surrender the collateral securities previously received. The mortgage was made by Collier and the collateral securities surrendered to him by the bank.

After this, the bank had no right to prosecute the judgment which it had obtained against Groves.

By the first agreement made between King and Collier, to which Groves was privy, Collier exonerated Groves, as far as it was in his power; and in consequence of the second agreement between Collier and the bank, Collier became re-invested with the whole control of the matter and his previous exoneration of Groves became immediately operative. Groves was, therefore, entirely discharged from all responsibility. The failure of Collier to comply with his contract with the bank, did not prevent this exoneration of Groves from being effectual.

THIS was an appeal from the Circuit Court of the United States for the District of Louisiana, sitting as a court of equity.

The facts in the case are set forth in the opinion of the court, to which the reader is referred.

It was argued by *Mr. M'Farland*, for the appellants, and *Mr. Johnson*, for the appellee.

The grounds upon which a reversal of the decree was claimed, were the following:

It ought to be remarked, in the first place, that the only contract to which the bank admits itself to have been a party, after the rendition of their judgment against Groves, was a new mortgage given by Collier to Pegram, their agent, about the month of December, 1841, and of that contract there is no copy in the record, and it was not in evidence in the court below. Now, it is in reference to that contract that the bank, while admitting that it was understood at first, that the collateral security was to be surrendered to Collier, yet, he neither paid the notes secured by the new mortgage, nor did he insist on the surrender of the collaterals, but expressly waived the assignment of the judgment and consented that it should stand as additional security for Collier's debt, inasmuch as it turned out that the property was subject to heavy previous incumbrances. Is there any thing in the record in reference to that contract from which this court can infer an intention on the part of the bank to operate a novation unconditionally of the judgment against Groves, which is not even alleged in the bill, and to substitute in its place a new mortgage on the property of Collier, and his promissory notes? Such a security will be regarded by the law of Louisiana, where the contract was entered into, as cumulative, unless the previous debt was released in express terms. It is of the essence of a novation that the first debt be extinguished, and a new one substituted in its place; a novation is never presumed. See Louisiana Code, art. 2181, et seq.; 2d Annual Reports, 188; Parker v. Alexander.

It is an ominous circumstance in reference to this new con-

tract or mortgage, that it was not produced in evidence by the party claiming the benefit of its stipulations. If it had contained an absolute release of the judgment against Groves, the sagacious and able counsel of the estate would not have failed to introduce it in support of the allegations in their bill. As it was in their power and was withheld, we have a right to infer that its production would have made against them.

But there is another view of this matter which, it appears, was absolutely insuperable.

Moses Groves was not a party to the new contract in 1841, and he now seeks to avail himself of a stipulation in his favor contained in it. This is what, in the technical language of the civil law, is called a *stipulation pour autrui*, or a stipulation in favor of a third person. The doctrine is well settled, that third persons may accept such stipulation in their favor, and enforce them either by action or exception. But before such acceptance and its notification to the parties, it may be retracted and desisted from, and the third person has no right to complain. Now in this case, it appears that Collier waived the release of the collateral security previously given, and agreed that the new mortgage should stand as additional security for the debt due to the bank, long before Groves sought to rely upon it as a discharge of the judgment against him.

See Flower *v.* Lane et al. 6 Martin, N. S. 152; Pemberton *v.* Zacharie et al. 5 La. R. 316; Mayor et al. *v.* Bailey, 5 Martin, 322; Marigny *v.* Remy, 3 Martin, N. S. 607.

We come now to examine the contract between Collier and King, on which the complainants rely in their bill as evidence of a discharge or payment of the judgment against Groves. It is remarkable that neither the bank nor Moses Groves was a party to that agreement. Collier did not even assume to act as the agent of the bank, much less is there any proof that he was so, or that his agreement with King was ever known to the bank. The whole purport of that agreement was, that Collier was to be permitted to purchase certain property of King's at sheriff's sale, at a certain price, and if he did so, Collier would grant full acquittance of certain debts, and particularly to Moses Groves, a full acquittance of all demands against said Groves, for and on account of said judgment obtained by the Farmers' Bank of Virginia.

The property which Collier was authorized to purchase on these conditions, is enumerated in the contract, consisting of sundry tracts of land, and a large number of slaves. Now, the only evidence that he purchased any part of the property in pursuance of the agreement, is found in a sheriff's deed, and a

simple comparison between the agreement and the sheriff's deed will show that a large part of the property of King never was sold according to that agreement. The condition, therefore, upon which Collier was himself bound to procure a release of the judgment in favor of the bank, has not been complied with, and even between him and King no such obligation has resulted from the sale, much less is there any thing in the whole transaction which is binding on the bank. It was as to the bank, *res inter alios acta.*

There is not the least pretext for saying, that the bank ever ratified and approved this agreement, or that they ever had any knowledge of it.

Mr. Justice NELSON delivered the opinion of the court.

This case comes up on an appeal from a decree of the Circuit Court of the United States for the District of Louisiana.

The case is somewhat complicated and confused, and it will be necessary to state the material facts to be found in it in order to present clearly the legal questions involved, and upon which the decision must depend.

On the 13th March, 1837, Thompson L. King drew two drafts, amounting, in the aggregate, to fifteen thousand four hundred and ninety-seven dollars, in favor John E. Hunter, upon Moses Groves, who duly accepted the same. The liability of Groves upon these drafts to the bank constitutes the main point in the controversy. The drafts were subsequently, but before maturity, indorsed by Hunter to Lewis A. Collier, and by him passed to the Farmers' Bank of Virginia, the appellants, as collateral security for an indebtedness to the Bank. Groves was an accommodation acceptor for the benefit of King, the drawer.

The bank recovered judgment against Groves for the amount of the drafts in the Madison District Court of Louisiana, December 1, 1840, and which was recorded in the office of the parish judge on the same day, in the parish of Madison, where the defendant resided, so as to operate as a judicial mortgage on his real estate and slaves. The bank recovered judgment also against King, the drawer, on one of the drafts; and, at the same time, held other judgments and demands against him, in which Collier was interested, to the amount of some fifteen thousand dollars. These judgments and demands had been pledged to the bank by Collier as collateral security for his indebtedness.

On the 26th February, 1841, a written agreement was entered into between Collier and King, in which, after reciting the several judgments and demands above stated, and held by the bank against King, and in which Collier was interested; and also

reciting and describing certain plantations and lands, belonging to the said King, containing in all about twenty-two hundred acres, and a large number of slaves on the same, it was agreed, among other things, that if the said Collier should be permitted to purchase the said property at sheriff's sale on any of the aforementioned judgments for his own account, or for the account of the bank, at a sum not exceeding the whole amount of the several judgments and demands, or for a less sum; that then, and in that case, the said property should be received by him in satisfaction and discharge of the same; and the evidences of the several debts and demands thus held by him and the bank should be delivered up to the persons entitled to the same; and full discharges given; and especially to Moses Groves for and on account of the judgment obtained by the Farmers' Bank of Virginia against him.

There are several other provisions and stipulations in said agreement; but, as they have no necessary bearing upon the material questions in the case, it is unimportant to notice them. Groves was a witness to this agreement.

In pursuance of this arrangement Collier became the purchaser of the property on the 13th of March, 1841, for the sum of $32,515, and received a deed of the same from the sheriff on the sixteenth of the month thereafter.

On the 1st of December, 1841, the Farmers' Bank of Virginia proposed to Collier, through their authorized agent, an arrangement of his indebtedness to them, as follows:

1. The bank to give him a credit on the same of one, two, and three years. 2. And surrender all the collateral securities which they had received from him. And Collier, on his part, 1. To pay all the expenses of prosecuting the collateral securities to the attorneys in whose hands they are. 2. To give a mortgage, which was to operate as a judicial mortgage in favor of the bank, on all the property which he held in Concordia parish. 3. To assign to the bank certain notes, as collateral security, which he held against Dix & Glascock, amounting to $9000. 4. To have all the mortgages that appear as incumbrances upon the property reduced by a discharge of record to an amount not exceeding thirty-five thousand dollars, besides those in favor of the Bank of Virginia, and Lancaster, Denby, & Company. And 5. To give three notes to the bank, one for $11,764.68, payable in twelve months after date, one for $12,470.57, payable two years after date, and one for $13,218.80, payable three years after date, amounting, in the aggregate, to thirty-seven thousand four hundred and fifty-four dollars, five cents.

This is the substance of the proposition made by the agent, and which was intended as instructions to F. H. Farrar, his

attorney, under whose direction the mortgage was to be prepared and executed.

On the 3d of December, 1841, the mortgage was duly executed by Collier, and delivered to Farrar, and accepted by him on behalf of the bank.

It was recorded in the proper office, and a copy with the three notes transmitted by mail to the bank agreeably to the instructions.

On the 20th of April, 1843, the Farmers' Bank of Virginia applied to the judge of the Circuit Court of the United States, in the District of Louisiana, for an executor's process against the estate of Groves, he having died in December, 1841, praying that so much of his estate might be seized and sold as should be necessary to satisfy the judgment, which had been obtained by the bank against him December 1st, 1840, and which we have already referred to; and an order was granted accordingly; whereupon, Horace H. Groves, the son of the deceased, and administrator of the estate, filed the bill in this case in the Circuit Court of the United States, setting out, substantially, the facts already recited, and praying that the bank may be enjoined from proceeding to seize and sell any part of the estate, that the executory process may be set aside, and the bank decreed to enter satisfaction of the judgment of record.

The answer of the bank denies the authority of Collier to act for them in any settlement or discharge of the judgment, or for any purpose in connection therewith. They also deny that they ever gave their assent to the alleged discharge of the debt for which the judgment was rendered, or ever ratified or confirmed the acts and doings of Collier in relation thereto.

They further allege, that Collier was indebted to them in the year 1837, in a large amount, and that he transferred to them the acceptances of Groves, mentioned in the bill, as far back as 1837 and before they reached maturity, as collateral security for his indebtedness. That they never intended to place the bills under the control of Collier, but held them as their own, and prosecuted them to judgment. Nor did they ever allow him to take the charge and management of the judgment as their agent after it was recovered.

They further allege, that being delayed in the collection of the collateral securities, and receiving no payments from Collier, they employed James W. Pegram, in November, 1841, as their agent, to call upon Collier, at his home, with instructions to obtain a more satisfactory arrangement of the debt against him. That it resulted in the extension of the time of payment on his giving the mortgage and notes referred to in the bill. They admit it was understood between their agent and Collier, that

the negotiable paper which had been transferred as collateral security was to be surrendered up to him, the security furnished by the mortgage being, as represented by him, sufficient to secure his indebtedness, and relying on his punctuality in the payment of the notes as they became due.   That two of the notes provided for by the mortgage are already past due, and nothing paid by the° said Collier; that the property covered by the mortgage is discovered to be liable under previous incumbrances to a large amount, which may render it insufficient for the payment of their debt.   That said Collier has long since waived the assignment of the said judgment, and consented that the bank might retain it as additional security.

The court below granted a preliminary injunction, and afterwards at the hearing on the pleadings and proofs, confirmed the same, and decreed, that satisfaction of the judgment against Groves should be entered of record.

Upon full consideration we are of opinion this decree is right, and should be affirmed.

King, the drawer of the bills, was the principal debtor, as the acceptance by Groves was for his accommodation.   He was therefore bound to provide for them and keep Groves harmless; and this he did, so far as the interest of Collier was concerned, by the agreement of 26th February, 1841, and subsequent purchase by Collier of the plantation and slaves in pursuance of its stipulations.   The purchase and title of the property under the sheriff's sale, it was agreed, should be made, and taken in satisfaction of this among other demands against King; and in order to complete the satisfaction, Collier bound himself to procure a discharge of the judgment which the bank had recovered upon the drafts, and then held.   Groves was privy, and consenting to this arrangement between King and Collier, and, as between the latter and him, when consummated, it constituted a valid defence to the drafts or judgment either in law or equity.

It is true, as the bank was not privy and consenting to the arrangement, their interest in the drafts was unaffected by it, and they were still at liberty to enforce their judgment against Groves, if necessary to the payment of the debt for which the drafts had been pledged as security.

But, on the 3d of December following, they entered into an arrangement with Collier by which it was agreed that, on the execution and delivery to them of three notes, payable in one, two, and three years, covering the whole amount of his indebtedness to the bank, together with a mortgage upon a large plantation and slaves, besides other real estate, as security for the payment, all the collateral securities previously held for the indebtedness should be given up to him.   The notes and mort-

gage were executed and delivered accordingly, and the collateral securities surrendered, and the interest in them again exclusively vested in Collier; and in this way becoming the owner of the drafts and judgment against Groves, for which he had already received satisfaction, and bound himself to procure a discharge from the bank, the agreement with King, the principal debtor, operated instantly as an extinguishment of the demand; and placed it beyond the power of either Collier or the bank, or both of them together, to revive it by any subsequent arrangement. The defence of Groves, arising out of the agreement of King with Collier, attached immediately on the bank reinvesting Collier with their interest in the drafts, and would adhere to them into whosoever hands they might pass. They were not only bills over due, but had become merged in judgment against Groves.

It has been argued, on behalf of the bank, that Collier failed to comply with all the conditions upon which they stipulated to accept the mortgage and surrender the previous collateral securities; and especially in one important particular, namely, the discharge of record of existing incumbrances upon the property so as to reduce them to an amount not exceeding $35,000.

But there are several answers to this objection.

In the first place, the weight of the proof is, that the agent, after an investigation and examination of these incumbrances, waived the discharge of record, being satisfied that they had been paid from the representation of Collier.

And in the second, no such ground of defence is set up in the answer, nor is. there any allegation of imposition or fraud by Collier in the transaction. And, in the third, assuming that there was, the bank could not avail themselves of it for the purpose of avoiding their part of the arrangement, and, at the same time, hold on to the mortgage as a security for Collier's indebtedness. There has been no surrender of the mortgage, on the part of the bank, or offer to surrender and vacate the agreement. On the contrary, it is claimed by them as an available security, held and relied on against Collier.

It may be, that if a fraud had been committed upon the bank, in the negotiation to substitute this mortgage for other collateral securities, upon a surrender of the mortgage and notes accompanying it to Collier, on a discovery of the fraud, claiming to vacate the arrangement on this ground, their right to and interest in the securities surrendered, in the absence of any prejudice to the rights of third persons acquired, in the mean time, might revive; and, in this way, the defence of Groves be overreached, the bank being thus remitted to their original rights. But, be this as it may, as no such step has been taken, nor even claim of fraud set up in the pleadings, we are bound to regard the ar-

rangement as valid and binding upon both parties; and if any fraud or imposition has been committed to the prejudice of the bank, they must look to him personally for compensation and redress. The rights acquired by each party to the securities exchanged, must be taken to be such as were intended by the terms of agreement; and, regarding the transaction in this light, it is clear, even conceding, as is alleged, that Collier has since waived the surrender of the collateral securities for which he had stipulated, or has since reassigned them to the bank, the defence of Groves is still complete. These drafts, and judgment upon them, became extinguished the moment the agreement between the bank and Collier was carried into execution. They then became the exclusive property of the latter, in which event his agreement with King, the principal debtor, worked an immediate satisfaction.

It has, also, been argued, that King has failed to fulfil all the stipulations in his agreement with Collier, and hence that it is not available to Groves. But this is a question exclusively between him and Collier, who, for aught that appears, is content with the agreement in the way it has been carried into execution. He purchased the property and took the sheriff's deed as is alleged, and not denied, went into the possession and enjoyment of the estate, and still holds it. And, if he has not acquired all the property stipulated for in his agreement, he must look to King, personally, for compensation and redress. He has chosen to accept the execution of the agreement, and must be deemed bound by its stipulations.

In every view we have been able to take of the case, we are of opinion the decree of the court below is right, and should be affirmed.

### Order.

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.